UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

BONNIE MAY CLOUGH,

                Plaintiff,

       -vs-

NANCY A. BERRYHILL, *Acting Commissioner of Social Security*,

                Defendant.

DECISION AND ORDER

17-CV-6375-CJS

_____

**APPEARANCES**

| | |
|---|---|
| For Plaintiff: | Howard D. Olinsky, Esq.<br>Olinsky Law Group<br>300 South State Street Suite 420<br>Syracuse, NY 13202<br>(315) 701-5780 |
| For the Commissioner: | Catharine Louise Zurbrugg, Esq.<br>Social Security Administration<br>Office of General Counsel<br>26 Federal Plaza Room 3904<br>New York, NY 10278<br>(212) 264-0676<br><br>Kathryn L. Smith, A.U.S.A.<br>United States Attorney's Office<br>100 State Street, Fifth Floor<br>Rochester, NY 14614<br>(585) 263-6760 |

**INTRODUCTION**

**Siragusa, J.** Bonnie May Clough ("Plaintiff") brings this action pursuant to Title II of the Social Security Act seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security in-

come benefits. Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the reasons set forth below, the Court denies Commissioner's cross-motion for judgment on the pleadings, ECF No. 13, and grants Plaintiff's motion, ECF No. 9. The Court reverses the Commissioner's decision denying benefits and remands this matter for a rehearing pursuant to sentence four of 42 U.S.C. § 405(g). The Court directs the Commissioner to expedite the rehearing in this case.

## PROCEDURAL HISTORY

On December 11, 2014, Plaintiff filed a claim for Supplemental Security Income, alleging disability beginning on October 16, 2014. R. 143. The Social Security Administration denied her claims on February 12, 2015, and she appeared by video conference before an Administrative Law Judge ("ALJ") for a hearing on September 7, 2016, at which a vocational expert also testified. An attorney represented Plaintiff at the hearing. The ALJ issued a decision on November 9, 2016, which Plaintiff appealed. The Appeals Council affirmed the ALJ's decision on April 11, 2017, and Plaintiff commenced this action pursuant to 42 U.S.C. § 405(g) on June 14, 2017. The Court heard oral argument on April 19, 2018.

## THE ALJ'S DECISION

The ALJ applied the Commissioner's five-step sequential evaluation for adjudicating disability claims, 20 C.F.R. §§ 404.1520, 416.920. At step one, the ALJ found Plaintiff had not engaged in any substantial gainful employment since October 16, 2014. R. 25. At step two, the ALJ determined that Plaintiff had the following severe impairments: Degenerative Disc Disease—Cervical Spine, Generalized Anxiety Disorder, Social Phobia,

and Depression. However, at step three, the ALJ found that the impairments, either singularly or together, did not meet or medically exceed the severity of one of the Commissioner's listed impairments. R. 25–26.

Before proceeding to step four, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b). He added the following restrictions:

> This individual cannot crawl and cannot climb ladders, ropes or scaffolds. The individual is limited to perform simple, routine tasks, and to making simple work-related decisions. This individual requires a work environment where change is minimal. The individual cannot perform work that involves conveyor belts or assembly lines. And this individual cannot tolerate any contact with the general public, and that would be in-person contact. She is limited to work settings without excessive background noise; she can have no public interaction and only superficial contact with coworkers and supervisors; and she can do no assembly line or fast paced work.

R. 59. Plaintiff had no past relevant work. R. 32. At step five, considering her age, education, work experience, and RFC, the ALJ determined that a significant number of jobs existed in the national economy that Plaintiff could perform, specifically: stock clerk, housekeeping/cleaner, and mail clerk. R. 32. Accordingly, the ALJ found Plaintiff not disabled. R. 33.

## SCOPE OF REVIEW

A district court may set aside the Commissioner's disability determination only if the Commissioner's "substantial evidence" is not present to support it, or if the Commissioner committed legal error. 42 U.S.C. § 405(g); *see also Green-Younger v. Barnhart*, 335 F.3d 99, 105-06 (2d Cir. 2003). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). "The deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." *Byam v.*

3

*Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003) (citing *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).

## DISCUSSION

Plaintiff argues that the ALJ committed reversible error when he failed to accord controlling weight to the opinion of Plaintiff's treating psychiatrist, Ronald D. Spurling, M.D., and failed to reconcile the opinion of consultative examiner Yu-Ying Lin, Ph.D., with medical source statements. The Commissioner counters that the ALJ properly found the Dr. Spurling's conclusions were contradicted by his own examination findings, that Plaintiff's reported activities were inconsistent with her allegations of disability, and that the ALJ's residual functional capacity finding is supported by substantial evidence in the record.

*Dr. Spurling*

For claims filed before March 27, 2017, the Commissioner applies this rule to the evaluation of treating physician opinions:

> (2) Treatment relationship. Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's medical opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the medical opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion.

20 C.F.R. § 416.927(c)(2) (2017).

4

Dr. Spurling is a psychiatrist at FLH Medical, P.C., in Geneva, New York, certified by the American Board of Psychiatry & Neurology-Psychiatry.[1] He has been treating Plaintiff since September 8, 2014, for anxiety and saw her frequently. At that first examination in September of 2014, Dr. Spurling prepared a report. R. 344–50. With regard to Plaintiff's employment history, Dr. Spurling noted that she,

> has worked at various jobs over the years, mostly doing custodial work. She says she would not work anywhere more than a year, because she always had difficulty with transportation and would have to give up her job because her husband needed the car since he made more money. She does report a history of one previous inpatient psychiatric hospitalization in 2008 related to homicidal ideation towards her husband because she felt he was thinking [sic] around with the wrong people. She says she was throwing knives at him. More recently, she has been becoming stressed at home because her husband was laid off and may have financial stressors.

R. 344. Plaintiff reported, "her primary problem is her anxiety and stress." *Id.* She also reported that her father was an alcoholic, her older brother has schizophrenia, and her oldest son "has some type of psychiatric process, but he has not been diagnosed or treated." R. 345. The list of medications Plaintiff was prescribed took two paragraphs to describe. R. 346. Dr. Spurling concluded his report with the following:

> I do agree with her assessment her primary issue is anxiety. I think she has had a long-standing generalized anxiety disorder and she is also describing a social phobia. She is very preoccupied around her young adult sons and concerns from them. She also has multiple other stressors with her primary relationship and financial stressors. There Is no evidence of psychosis. There is no clear evidence of a bipolar process. She denies any significant use of alcohol or substances, but a urine drug test was positive for marijuana in March of this year. She seems to have cluster B., dependent and avoidant maladaptive personality traits.

---

[1] RochesterHealth.com. (2018, March 3). Ronald D. Spurling. Retrieved April 16, 2018, from http://www.rochesterhealth.com/healthcaredirectory/profile/3754263022/ronald-d-spurling-md-psychiatry-neurology-psychiatry.

> She is clearly very anxious around taking medications and repeatedly states that she feels she is on too many medications. I strongly suspect that she is noncompliant or intermittently compliant with many of her prescribed medications. She is prescribed 2 different benzodiazepines, but seems to essentially only take the Klonopin 0.5 mg b.i.d. on a regular basis, and very real he takes [sic] the lorazepam but she has also been prescribed. She may continue to take benzodiazepines. I have decided to add Depakote ER 500 mg tablets, one tablet by mouth at bedtime to attempt to help with her anxiety, ruminations and insomnia. She is to call difficulties. She is to followup in 6–8 weeks.
>
> **Axis** I: Anxiety Disorder Generalized, Pain Chest Other, Social Phobia, Palpitations, Depression NOS, Hyperlipidemia Mixed, Cannabis Abuse Episodic, Hypertension Unspec, Tobacco Use Disorder
>
> **Axis** II: Dependent and avoidant traits
>
> **Axis** III: Chronic Obstructive Pulmonary Disease (COPD), Hypercholestremla and Hypertension
>
> **Axis IV**: Moderate: Financial stressors, poor social supports, poor family support, poor coping mechanisms
>
> **Axis V:** Current GAF Score: 46, Highest GAF Score: 50

R. 347–48.

Plaintiff saw Dr. Spurling on October 20, 2014, for a follow-up appointment. R. 415.

He noted in his report of the visit that Plaintiff:

> Today, she says she's "pretty good." She says she is still taking her anxiety pills. She says she is not taking the Depakote that I prescribed because she felt it made her too sleepy in combination with the pain medication that she takes at night she says she is sleeping well. She feels she is doing better overall because her significant other now is working again and she has less worries with finances and paying the bills. She says she really doesn't eat during the day, and is overly hungry at night. She denies any change in her weight. She denies any depression and says that her mood is better than at the last visit. She says she continues to be anxious and easily distracted.

R. 415. Dr. Spurling's examination revealed the following:

> **Mood/Affect:** Displays anxiety periodically during encounter. Patient reports improvement in mood since last visit. Patient's affect is anxious and brighter. **Language/Thought:** Speech is clear and appropriate for age. Language processing is intact. Thought processes demonstrate circumstantial thinking, but do not demonstrate delusional ideation or flight of ideas. Associative thinking is intact. Patient demonstrates preoccupations. **Cognition:** Alert and oriented x3. Memory is grossly intact. Attention span and concentration are grossly intact. Judgment is fair. Insight is fair. Impulse control is grossly intact.

R. 418. He concluded his report with the following plan:

> Intervention/Plan:
>
> She is returning today for followup of her generalized anxiety and social phobia with associated mood symptoms. She is denying any symptoms of depression and her anxiety is slightly better related to view her financial stressors since her husband now has a job. She continues to be quite anxious overall with exaggerated fears around her health and the safety of her children. She is describing difficulty with focusing and concentration secondary to her severe anxiety. She only took Depakote a few times, saying that she did not like taking it in addition to her pain medications at bedtime which made her overly tired. She does indicate that she feels her anxiety is still elevated and says that she would be willing to try something else for her anxiety and her difficulties with focusing and concentration. Therefore I have decided to try lamotrigine 25 mg tablets, 1 tablet daily at bedtime. increasing by one tablet every 2 weeks to a goal of 3 tablets daily. She is to continue her other medications unchanged. She is to call with difficulties. She is to followup in 6-8 weeks.

R. 418.

Dr. Spurling saw Plaintiff for a follow-up visit on December 2, 2014. R. 368–71. He reported that Plaintiff formerly worked in a park during the summer at Seneca Lake, and that she was then watching her niece to earn money. R. 369. Dr. Spurling noted, "[t]oday, she says she's 'feeling older,' noting that today is her birthday. She says that her mood is okay and overall she feels happy." R. 411. However, she also reported feeling tired and without motivation during the day, and attributed those moods to her medications. *Id.* He reported his examination results as follows:

7

> **Const:** Appears appropriately groomed and appropriately dressed. No signs of apparent distress present. Breath has no abnormal odor. Height Is within normal range. No involuntary movement. Facial expression appears pleasant.
>
> **Psych: Motor:** Motor activity Is WNL. **Mood/Affect:** Displays anxiety periodically during encounter. Patient describes mood as anxious and good. Patient's affect is anxious and variable.
>
> **Language/Thought:** Speech is overproductive, rapid and repetitive. Language processing Is intact. Thought processes demonstrate circumstantial thinking, but do not demonstrate delusional ideation or flight of Ideas. Associative thinking is intact. Patient demonstrates preoccupations. **Cognition:** Alert and oriented x3. Memory is grossly intact. Attention span and concentration are grossly intact. Judgment is fair. Insight is fair. Impulse control ls grossly intact. **Risk Assessment:** Suicidality: none. Homicidality: none. Dangerousness: none.

R. 370. Dr. Spurling noted that Plaintiff initially appeared "calmer, but as she speaks about her multiple stressors and physical concerns she becomes progressively more anxious and pressured." R. 370. He continued her on medications, added Wellbutrin to the list, and directed her to return in two months. R. 370.

On January 7, 2015, Dr. Spurling answered questions posed by the New York State Office of Temporary and Disability Assistance. R. 372. He reported that Plaintiff was anxious around medications and frequently non-compliant. R. 374. He described her ability to function in a work setting as "very limited because of anxiety," and her ability to do work related mental activities as "limited ability to work because of anxiety." R. 377. He did not offer an opinion on Plaintiff's understanding and memory, or her sustained concentration and persistence. R. 378. He described her social interaction and adaption as limited and wrote "anxiety," under the social interaction question. R. 378.

On January 15, 2015, Yu-Ying Lin, Ph.D., performed a consultative examination of Plaintiff. R. 385. Dr. Lin made the following observations of Plaintiff:

8

APPEARANCE: General appearance was about the same as stated age. She was dressed casually and was well groomed. Posture and motor behavior normal. Eye contact appropriate.

SPEECH: Fluent. Quality of voice clear. Expressive and receptive languages were adequate.

THOUGHT PROCESSES: Coherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the evaluation setting. Her thought content often focused on stress in the household where people do not help with the house chores or picking up after themselves.

AFFECT: Dysphoric.

MOOD: Dysthymic.

SENSORIUM: Clear.

ORIENTATION: x3.

ATTENTION AND CONCENTRATION: Appeared to be mildly impaired due to anxiety in the evaluation. Even though she was able to perform simple counting calculations and serial 3s, she appeared to have difficulty concentrating during recitation.

RECENT AND REMOTE MEMORY SKILLS: Appeared impaired due to anxiety in the evaluation. She recalled objects immediately, and 1 at a delay. She recalled 6 digits forward and 3 digits backwards.

COGNITIVE FUNCTIONING: Intellectual functioning appeared to be below average. General fund of information appropriate to experience.

INSIGHT: Fair.

JUDGMENT: Poor.

R. 386–87. The portion of Dr. Lin's report titled "mode of living," included this language: "She spends her days laying [sic] in bed and watching TV. She reports she does not feel like doing anything because it is not her responsibility to do the housework since the people in the household are grown." R. 387. In her medical source statement, Dr. Lin concluded the following:

9

> The claimant can understand simple directions and instructions. She can perform simple tasks independently. She is mildly limited in maintaining attention and concentration. She is able to maintain a regular schedule. She can learn new tasks. She can perform complex tasks with supervision. She is mildly limited in making appropriate decisions. She can relate adequately with others. She is markedly limited in appropriately dealing with stress. Difficulties are caused by distractibility and stress-related problems.

R. 387–88.

On January 16, 2015, Plaintiff saw Dr. Mane at FLH Medical. In the Objective portion of his report, Dr. Mane wrote, "[d]enies anxiety, depression and stress. Sleep: reports no sleep problems." R. 310.

On February 4, 2015, Dr. Spurling saw Plaintiff for a follow-up visit. R. 407–10. He described Plaintiff's mood and affect as: "Displays anxiety periodically during encounter. Patient describes mood as anxious and good. Patient's affect is anxious, depressed and more variable." R. 409. Under "Cognition," Dr. Spurling wrote: "Alert and oriented x3. Memory is grossly intact. Attention span and concentration are grossly intact. Judgment is fair. Insight is fair. Impulse control is grossly intact." R. 409. Under the section titled "Intervention/Plan," Dr. Spurling concluded:

> She continues to be extremely anxious and somatically preoccupied. She reports that she has discontinued the Abilify because of complaints of dizziness, nausea and other somatic complaints. But, she has ongoing similar complaints which she now associates with her antihypertensive medications. She is tearful and labile in her mood today and is focused on her belief that her significant other has only stayed with her because of the children that they had together and that he does not really love her. I have decided to try adding olanzapine 5 mg at bedtime to try to help her rumination, insomnia and the GI manifestations of her anxiety. I will have her continue the lamotrigine although I suspect that she is not really compliant with that medication. I have also increased the Klonopin to 0.5 mg 3 times daily as needed for anxiety or panic. She is to call with difficulties. She is to followup in 2 months.

R. 409.

On March 9, 2015, Plaintiff saw Dr. Spurling for a follow-up visit. R. 403. In his report, the doctor noted that Plaintiff "tells me she was denied again for disability. She asked if I will fill out paperwork for repetition for disability." R. 403. He noted that she reported sleeping better with the medication Zyprexa at bedtime. He also noted,

> She also asked me to write to read [sic] a letter for her to get DSS so that she can continue to get food stamps without having to look for work. She says that she does not feel that she is capable of working right now and needs more time to get better. She says perhaps in 3 or 4 months she would be able to work.

R. 403. Dr. Spurling noted that Plaintiff had an "[i]mprovement in mood since last visit" and that her "affect is less anxious, brighter and less depressed." R. 405. He also noted that her "[m]emory is grossly intact. Attention span and concentration are grossly intact. Judgment is fair. Insight is fair. Impulse control is grossly intact." *Id.* Under the heading of "Intervention/Plan," Dr. Spurling wrote in his Intervention/Plan section:

> Objectively, she appears much calmer today. She says she is taking the Zyprexa and that it is helping her with her sleep. I feel it is also helping with her mood. But, she is complaining of ongoing issues with anxiety, saying she has been under a lot of stress recently. She describes a chaotic environment in her home which exacerbates her stress. She complains of racing thoughts and mood swings with periods of irritability. I will have her continue the lamotrigine and Zyprexa at the current doses and I have decided to add clonidine 0.1 mg in the morning and 0.1 mg at 5 PM to help with her irritability and anxiety. I also gave her a new prescription for the as needed Xanax. I have noted that her primary care provider has placed a message in the electronic medical record that he will no longer prescribe pain medications because of her having a recent urine drug screen which was positive for cannabis. She had informed me whenever I initially evaluated her that she had used cannabis in the past but denied recent use, which is clearly not true as of the labs obtained in late January of this year. In regard to her application for disability. I told her I would be willing to do paperwork describing her issues with anxiety and her mood. I also agreed to give her a letter stating that she is unable to work at this time.

R. 405-406. Dr. Spurling wrote a letter for Plaintiff in which he stated that she "is unable to work at this time related to her anxiety and mood symptoms until further notice." R. 398.

Dr. Spurling completed a medical source statement on March 15, 2015. R. 394–96. The copy contained in the Record is particularly difficult to read. It appears the doctor did not respond "no" or "yes" to the first question about the claimant's ability to understand, remember and carry out instructions. He did mark the form to indicate she had mild limitations in understanding and remembering simple instructions, carrying out simple instructions, and the ability to make judgments (the remainder of the words are too blurred to read). R. 394. He marked the form indicating that she had moderate limitations in understanding and remembering complex instructions, carrying out complex instructions, and make judgments (the remainder of the words are too blurred to read). *Id.* Dr. Spurling noted, "her significant anxiety and social phobia cause her difficult with focusing, retaining information." R. 394. Despite marking the form to show Plaintiff had moderate limitations in understanding and remembering, he recorded in his examination report that Plaintiff's "[m]emory is grossly intact. Attention span and concentration are grossly intact. Judgment is fair. Insight is fair. Impulse control is grossly intact." R. 409.

Dr. Spurling also indicated on the form that Plaintiff had a marked limitation in interacting appropriately with the public and moderate limitations in interacting appropriately with supervisors and co-workers. One other category is too blurred on the form to read. R. 395.

Additionally, on March 15, 2015, Dr. Spurling completed a form entitled "Complete Medical Report (Mental)," and on it indicated the medications he had prescribed for Plaintiff. He also answered the question "Prognosis" as "Fair." R. 393.

On May 11, 2015, Dr. Spurling completed a medical source statement for New York State. R. 431. The form he used had three categories for mental functioning: No Evidence of Limitations, Moderately Limited, and Very Limited. R. 432. He marked the form to show that he thought Plaintiff was moderately limited in understanding and remembering instructions, carrying out instructions, maintaining attention and concentration, making simple decisions, interacting appropriately with others, maintaining personal hygiene, and functioning in a work setting at a consistent pace. R. 432. He marked that she was very limited in maintaining socially appropriate behavior without exhibiting behavior extremes. *Id.*

Dr. Spurling completed another medical source statement dated May 9, 2016. R. 439. In that report, he marked the following areas as moderately limited: understanding and remembering instructions; maintaining attention and concentration; and making simple decisions. He marked "No Evidence of Limitations" in maintaining basic standards of personal hygiene and grooming. And he marked as very limited the following: carrying out instructions; interacting appropriately with others; maintaining socially appropriate behavior without exhibiting behavior extremes and appearing able to function in a work setting at a consistent pace. R. 439.

The ALJ concluded that Dr. Spurling's March 2015 opinion and his May 2015 letter "appear to be unsupported by the medical record." R. 30. He noted specifically that Dr. Spurling's mental status examination results "revealed normal concentration, attention,

13

memory, and judgment." *Id.* For those reasons, the ALJ accorded "little weight" to Dr. Spurling's opinions. *Id.* The Commissioner expanded on the reasons for declining to give Dr. Spurling's opinion controlling, or great weight by pointing out that in a "Function Report – Adult," R. 184–92, dated December 23, 2014, Plaintiff noted that she went to doctors' appointments, church, and the food store every week. R. 193. She also responded that she did not have "any problems getting along with family, friends, neighbors, or others," and hand wrote, "I love everyone[.] I have a big heart." R. 189. She further indicated she finishes what she starts, but that "I start it, and go do something else, while it[']s not finish[ed] and before I know it the whole house is a mess." R. 191. She responded that she can follow spoken instructions if they are not too long and can follow written instructions. *Id.* In response to the question, "[h]ave you ever lost a job because of problems getting along with people?" she responded "No." *Id.* She also wrote that stress or changes in a schedule affect her "very, very, very bad. It acts up my COPD, my heart starts to get high blood pressure. Stress[,] I'm around it all day—every day!" R. 192.

The Commissioner also points out that Dr. Spurling frequently mentioned Plaintiff was either non-compliant, or only intermittently compliant with many of her prescribed medications. R. 347 ("I strongly suspect that she is noncompliant or intermittently compliant with many of her prescribed medications."); R. 409 ("I will have her continue the lamotrigine although I suspect that she is not really compliant with that medication."); R. 424 ("I strongly suspect that she is noncompliant or intermittently compliant with many of her prescribed medications."). Despite suspecting she was not entirely compliant with the medications he prescribed, Dr. Spurling noted during his October examination that she

had an improved mood possibly due to her husband's new job, which relieved some financial stress. Dr. Spurling also noted in his October examination that Plaintiff's memory, attention span, and concentration were intact and that her insight and judgment were fair. R. 418. David Mane, M.D., who, like Dr. Spurling, worked at FLH Medical, saw plaintiff on October 13, 2014. In a report signed just a few days before she saw Dr. Spurling for a second visit, Plaintiff reported "she is having less amount of anxiety," and Dr. Mane observed that she "[d]enies anxiety, depression and stress." R. 252–53. Plaintiff returned to FLH Medical on November 13, 2014, and saw Dr. Mane. R. 257. Dr. Mane noted that Plaintiff "has a lot of anxiety and neck tension… [and] constant daily pain." R. 258. However, when asked by the doctor, she "denie[d] anxiety, depression and stress… [and] reports no sleep problems." R. 258. Upon examination, Dr. Mane observed that Plaintiff "[a]ppears well. No signs of apparent distress present. Speech is clear and appropriate." R. 259.

Other medical evidence in the record in part contradicts Dr. Spurling's conclusions. The ALJ's reason for affording Dr. Spurling's opinions only little weight was that "mental status examination revealed normal concentration, attention, memory, and judgment." R. 30. However, the Commissioner's rule requires that the ALJ give the treating physician controlling weight, and if not, then "[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion." 20 C.F.R. § 416.927(c)(2). The ALJ failed to provide a good reason for not giving Dr. Spurling's opinion controlling weight. It is possible that after reviewing the factors in § 416.927(c), the ALJ can sustain his decision not to give Dr. Spurling's opinion controlling, or even substantial weight, but considering the length of treatment relationship and

frequency of examination, and the nature and extent of the treatment relationship, the explanation in this record is lacking.

## CONCLUSION

For the foregoing reasons, the Court denies Commissioner's cross-motion for judgment on the pleadings, ECF No. 13, and grants Plaintiff's motion, ECF No. 9. The Court reverses the Commissioner's decision denying benefits and remands this matter for a rehearing pursuant to sentence four of 42 U.S.C. § 405(g). The Court directs the Commissioner to expedite the rehearing in this case.

IT IS SO ORDERED.

DATED: May 7, 2018
         Rochester, New York

                                        /s/ Charles J. Siragusa
                                        CHARLES J. SIRAGUSA
                                        United States District Judge